# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| GABE KERI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:04-CV-224-TS |
| | ) | |
| BOARD OF TRUSTEES OF PURDUE | ) | |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On June 10, 2004, the Plaintiff, Dr. Gabe Keri, sued in this Court his former employer, Indiana Purdue Fort Wayne University (IPFW), and Does 1, 2, 3, 4, and 5. The Plaintiff, a black man and a native of Ghana, claims that IPFW discriminated against him on the basis of his race and national origin when it did not reappoint him as a teacher for the 2004–2005 academic year. He also believes that the university's decision not to reappoint him was further motivated by its desire to retaliate against him for voicing concerns that he was being mistreated by his supervisor and that the university engaged in discriminatory practices. In addition, the Plaintiff claims that the Defendant conspired to smear his reputation by falsely alleging that he sexually harassed some of his students and used ineffective teaching methodologies. Finally, the Plaintiff asserts that the Defendant is liable under the Indiana Tort Claims Act for intentional infliction of emotional distress, negligent infliction of emotional distress, negligent supervision, and common law wrongful termination.

On September 9, 2004, the Plaintiff moved the Court to amend the caption of the case to reflect that he was suing the Board of Trustees of Purdue University, not IPFW. The Court granted

the motion on September 10, 2004.

On April 7, 2005, Defendant Board of Trustees of Purdue University moved for summary judgment. On May 28, the Plaintiff filed a Response, and on June 10, the Defendant filed its Reply. On that same day, the Defendant moved to strike parts of the Plaintiff's Response. On June 22, the Plaintiff responded to the Defendant's motion to strike, and on June 28, the Defendant filed its Reply in support of the motion to strike.

On July 22, 2005, the Defendant filed a Motion to Bifurcate Damages Issues to which the Plaintiff did not respond.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

### A.  Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

---

[1]As will be explained below, Does 1, 2, 3, 4, and 5 are no longer proper parties in this suit. *See infra* at 24. Accordingly, only one Defendant, the Board of Trustees of Purdue University, remains in this case, to which the Court will refer as the "Defendant."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to

3

demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.


**B.  Defendant's Motion to Strike**

The Defendant moves to strike portions of the Plaintiff's Response, claiming that it contains statements that are hearsay, irrelevant, or beyond the knowledge of the witnesses. The Defendant challenges the following statements:

1.    Dr. Campbell-Watley complained bitterly about student evaluations that most students have not had black faculty and they can be brutal. (Pl.'s Facts 6; Libii Dep. 41).
2.    Campbell-Watley was promoted but she did not like it here long enough to stay.

4

(Pl.'s Facts 6; Libii Dep. 43).

3.    Campbell-Watley was happy to move to the University of North Carolina-Charlotte, because as "she put it, 'there were other people like me there and I feel more comfortable.'" (Pl.'s Facts 6; Hickey Dep. 13-14).

4.    Campbell-Watley is the second native-born African-American that has been tenured at IPFW in forty (40) years. (Pl.'s Facts 7; Libii Dep. 43).

5.    Libii's recollection is that "Dr. Utesch was berating black folks in meetings. I remember Dr. Keri mentioning this many, many times." (Pl.'s Facts 15, 16; Libii Dep. 46).

6.    Despite his experiences, Libii had never filed a complaint at a university. (Pl.'s Facts 17; Libii Dep. 48).

7.    Keri was about to be dismissed on bogus charges. (Pl.'s Facts 17; Libii Dep. 48–49).

8.    Carter left because she was unhappy with the climate. (Pl.'s Facts 20; Hickey Dep.12).

9.    Hickey testified that in her opinion, IPFW has a long way to go in being able to retain minority faculty. (Pl.'s Facts 20; Hickey Dep. 42).

10.    She further testified that the climate for diversity is not good. (Pl.'s Facts 20; Hickey Dep. 42).

11.    Libii has had the painful experience of seeing African-American or people of African descent come and go with pain. (Pl.'s Facts 20; Libii Dep. 36–37).

12.    They come with families, some of them break down and their marriages fall apart. (Pl.'s Facts 20–21; Libii Dep. 37).

13.    They come with hope and leave with despair. (Pl.'s Facts 21; Libii Dep. 37).

14.    A couple of SOE—Gregory and Beverly Bell—came and left disenchanted really angry with the University. (Pl.'s Facts 21; Libii Dep. 37).

15.    Dr. Sam White, in the School of Engineering, came and left disenchanted. (Pl.'s Facts 21; Libii Dep. 37).

16.    Dr. Solomon Waco came from Ethiopia in the Department of Sociology. He was raving about how he was treated. (Pl.'s Facts 21; Libii Dep. 37–38).

17.    Dr. Geneva Herd in SPEA came and left. (Pl.'s Facts 21; Libii Dep. 38).

(Def.'s Mem. Supp. Mot. Strike 2–3.)

The Plaintiff argues that all challenged statements are proper for the Court's consideration.

**(1) *Statements 6 and 11***

The Defendant argues that statements 6 and 11 are irrelevant to the Plaintiff's claims because they belong to Dr. Josue Njock Libii who is associated with the Defendant's School of Engineering, Technology, and Computer Science, not the School of Education. The Plaintiff insists that the

statements are relevant because both Dr. Libii and the Plaintiff are of African descent, taught at IPFW, were subject to the same tenure and promotion standards, were subordinate to Dr. Susan Hannah, the Vice Chancellor of Academic Affairs of IPFW, and Michael Wartell, the Chancellor of IPFW, and had doctoral degrees. The Plaintiff submits that Libii's testimony that his own opportunities at IPFW were stifled creates a mosaic of evidence that the Defendant intentionally discriminated against the Plaintiff. In support of this position, the Plaintiff relies on *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005).

The Plaintiff's reliance on *Jordan* is misplaced. The portion of *Jordan* cited by the Plaintiff explains a plaintiff's burden under the direct evidence method to show employment discrimination. *See id.* It tells nothing about what constitutes relevant evidence within the *McDonnell Douglas* framework, under which the Plaintiff challenges the Defendant's Motion for Summary Judgment. Instead, the Plaintiff should have considered Federal Rule of Evidence 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

In light of this Rule, the similarities between Dr. Libii and the Plaintiff are too remote for Statements 6 and 11 to have any relevance to the Plaintiff's claims. The two men worked at different schools of IPFW and had different immediate supervisors. In addition, Dr. Libii was tenured ten years before the Plaintiff was hired by IPFW. Most of the Plaintiff's dealings were with Dr. Utesch whom Dr. Libii never even met. Moreover, any probative value of Libii's statements is substantially outweighed by the danger of unfair prejudice, which is another reason for excluding these statements from the record. *See* Fed. R. Evid. 403. Therefore, the Court will strike Statements 6 and 11 from

the Plaintiff's Response.


**(2) *Statements 1–4, 8, and 11–17***

Statements 1–4, 8, and 12–17, asserted either by Dr. Libii or Dr. Gail Hickey, describe other professors' experiences at IPFW. For example, statements 1–4 speak of Dr. Campbell-Watley, one of the two African-Americans tenured at IPFW, who complained bitterly that most students were not taught by black faculty. Dr. Campbell-Watley "did not like it here long enough to stay" and was happy to move to the University of North Carolina-Charlotte. Statement 8 tells of Carter, who was unhappy with the school's climate. Statements 12 and 13 describe the faculty members who came to IPFW with families with hope but had to leave in despair. Some of their families broke down and marriages fell apart. Statements 14–17 depict disenchanted and angry faculty members, who left the university because of the way they were treated, presumably, by the university.

The Defendant argues that these statements are inadmissible and should not be considered by the Court on summary judgment. The Plaintiff responds that the statements are admissible under Federal Rules of Evidence 701 and 801(d)(2)(D) because they either express opinions of the statement giver or are offered against the Defendant as statements by the Defendant's agents or servants concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

To fall within Rule 801(d)(2)(D) a statement must be about a matter "within the subject matter of the agency." *Young v. James Green Mgt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003). Furthermore, "in the context of employment discrimination cases, 'the declarant must be involved in the decisionmaking process affecting the employment action involved.'" *Id.* n.2 (citing *Aliotta*

*v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir.2003)).

Libii's and Hickey's statements fail to satisfy either requirement. First, they do not concern the matter of their agencies as IPFW professors: they do not relate to teaching or some other functions of their job. Rather, Dr. Libii and Dr. Hickey are describing their colleagues' alleged frustrations while working at IPFW. Second, neither Dr. Libii nor Dr. Hickey had any decisionmaking authority regarding other faculty members' employment.

What is more, Libii's and Hickey's assertions are not proper Rule 701 opinion statements, which "most often take[] the form of a summary of first-hand sensory observations." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences . . . . Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property.

*Id.* n.2 (citing *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196–98 (3d Cir.1995)). Dr. Libii and Dr. Hickey are offering not their sensory but mental observations, dispersed with hearsay, and not relevant to the Plaintiff's claim that the Defendant discriminated against him on the basis of his race and national origin. Finally, the described problems of other faculty members are too vague to be blamed on either the persons directly involved in this lawsuit or the Defendant in general.

**(3) *Statements 5 and 7***

The Defendant wants the Court to strike Libii's Statement 5 that "Dr. Utesch was berating

black folks at meetings," because Dr. Libii himself had no personal knowledge of that. The Plaintiff argues that the statement should not be stricken even as hearsay because it has circumstantial guarantee of trustworthiness required by the Federal Rule of Evidence 807 (residual exception to the hearsay rule).

The Seventh Circuit has directed the courts to narrowly construe the residual exception to the hearsay rule. *See Akrabawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998) ("We begin by noting this circuit's emphasis on narrowly construing the residual provision to prevent it from becoming the exception that swallows the hearsay rule."). Five elements must be satisfied before hearsay is admitted in evidence: "(1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999). "Critical to the admission of a hearsay statement under 803(24) [now 807] is a finding by the district court that the statement is trustworthy."

The Court does not believe that all these elements have been satisfied. Libii's statement that Utesch berated black folk is entirely based on what the Plaintiff told him. Dr. Libii himself has never met Utesch and has never attended a faculty meeting at the School of Education. Although Dr. Libii is a disinterested party, the source of his knowledge is the Plaintiff himself. There is no evidence that Dr. Libii learned of Dr. Utesch's conduct during the faculty meetings from any other person. As such, the statement lacks guarantees of trustworthiness so as to be admitted in evidence. Accordingly, the Court will not consider Statement 5.

Likewise, Statement 7, that "[the Plaintiff] was about to be dismissed on bogus charges," is not based on Libii's personal knowledge. The Plaintiff has not presented any material facts that would show how he knew that the charges were bogus. Accordingly, the Court will not consider

Statement 7 in its ruling on the Defendant's motion for summary judgment.

### (4) *Statements 9 and 10*

Statements 9 and 10 were taken out of the context of Hickey's overall testimony. They appear to indicate that Dr. Hickey believed that IPFW's climate for diversity was not good and, as a result, the university had a long way to go to retain minority faculty members. However, when Hickey's entire testimony is considered, it is obvious that she is troubled not so much with IPFW's policies as with the local community's perception of minorities. She listed other reasons too as to why she thought minority faculty members did not remain at IPFW:

> It could be a variety of reasons having to do with the pay scale, which is, you probably know, at the bottom of the state barrel and not growing. It could be that the raises that we get for the most part aren't reflective of the amount of work we do. It could be the climate of Fort Wayne/Allen County is still unfortunately, in my mind at least, not very open to diversity. In fact when I came here in 1988, I had to send newspaper clippings, current newspaper clippings from 1988 and 1989, to my colleagues in Tennessee and Georgia and Alabama who—everybody thinks the deep south is prejudiced, is backward when it comes to racial relations. And my colleagues there absolutely, positively did not believe my phone calls, my written communications saying we were still dealing with desegregation here in the schools, in Allen County/Fort Wayne Schools. They absolutely did not believe me. I had to cut articles out of the paper and send them to the them before they would believe it. So maybe it has to do something with the climate for diversity in this area. Which I hope is changing.

(Hickey Dep. at 42–44)

The Court will not strike Statements 7 and 10, which are her opinions, but will consider them in the context in which they were pronounced.

## C.  Material Facts

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiff's favor,

the facts assumed to be true for the purposes of ruling on the Defendant's Motion for Summary Judgment are as follows:

**(1) *IPFW's Structure***

Indiana University Purdue University at Fort Wayne (IPFW) is jointly owned by Indiana University (IU) and Purdue University, and managed by Purdue pursuant to an agreement between the universities. According to this agreement, Purdue is the responsible corporation with full power, authority, and responsibility to manage and operate IPFW for the benefit of Purdue and IU. Purdue is responsible for the business operations of IPFW, including fiscal management and control. IPFW's chancellor is appointed and employed by Purdue, with the approval of IU, and reports to the Purdue president. Purdue appoints and employs all other administrative officers, faculty, and staff members. Purdue establishes, charges, and collects all tuition and fees related to IPFW. The Board Trustees of Purdue University is a corporate body created by the Indiana legislature.

IPFW's School of Education consists of two departments: Department of Professional Studies, guided by Dr. William Utesch, and the Department of Educational Studies, guided by Dr. Kathleen Murphy. The School of Education is headed by Dean Roberta Wiener, who reports to Dr. Susan Hannah, the Vice Chancellor of Academic Affairs of IPFW. Dr. Hannah, in turn, is accountable to Michael Wartell, the Chancellor of IPFW.

**(2) *Plaintiff's Hire***

The Plaintiff is a black man and a native of Ghana. He lived there until the age of nineteen. In 2000, the Plaintiff was attending a meeting of the Indiana Counselor Educators and Supervisors,

11

where he met Dr. James Burg of IPFW's School of Education. During a conversation, Dr. Burg advised the Plaintiff that the School of Education was looking to hire a counseling coordinator.

The Plaintiff applied for the position, but while he was away in Africa, Dr. Utesch left a telephone message for him, indicating that he was not being considered for the position. After returning from Africa, the Plaintiff went to IPFW to speak with Dr. Utesch. However, Dr. Utesch was not available, and the Plaintiff spoke with Dr. Burg, who told him that the search committee was considering a list of other applicants.

The search committee, however, failed to find an appropriate person for the position. As a result, Dr. Utesch suggested to the committee that it reconsider the Plaintiff because he had heard good things about him and found him to be articulate and passionate about school counseling. The committee agreed with Dr. Utesch, who then called the Plaintiff to advise him that he was once again being considered for the position. The Plaintiff had a series of interviews, which resulted in his appointment as a tenure track Assistant Professor of Education for the 2000–2001 academic year. The Plaintiff's hire was initially requested by Dean Wiener, and after a positive recommendation from Dr. Hannah, the request was approved by Chancellor Wartell. Dr. Utesch strongly supported the hiring decision.

During the time the Plaintiff was employed at IPFW, the School of Education had about twenty faculty members. One other person, beside the Plaintiff—Dr. Gloria Campbell-Watley—was of African descent.


**(3) *Plaintiff's Performance***

As a faculty member on tenure track, the Plaintiff was subject to once-a-year evaluation by

the university. The evaluations focused on three areas: teaching, research, and service. Satisfactory performance in all three areas assured a tenure candidate's reappointment for the following academic year.

The Plaintiff would first be evaluated by his immediate supervisor, Dr. Utesch. After Dr. Utesch's evaluation, he would be independently reviewed by the Dean of the School of Education, Dr. Wiener. Dean Wiener then would make her own recommendation regarding the reappointment, and both Dr. Utesch's and Dean Wiener's recommendations would be forwarded to Dr. Hannah, the Vice Chancellor of Academic Affairs. Dr. Hannah then would make her recommendation regarding the reappointment, and would forward it and Dr. Utesch's and Dr. Wiener's recommendations, along with the materials submitted by the Plaintiff, to Chancellor Wartell, who would make the final decision about reappointment. This process would have continued until August 2007, when the Plaintiff would have become eligible for tenure.

(a) *Plaintiff's First Evaluation*

The Plaintiff was first evaluated on January 5, 2001, about six months after he began working at IPFW. Dr. Utesch found that the Plaintiff was a competent instructor and a prolific writer, and was impressed with the Plaintiff's research. Among other things, Dr. Utesch noted:

> Solicited and unsolicited comments attested to [the Plaintiff's] competence and passion as an instructor. I recommend that [the Plaintiff] continue to make adjustments as he orients himself to the program. I am impressed with his dedication to course preparation and his genuine support and encouragement of students. I suggest that [the Plaintiff] provide a variety of evidence to document effectiveness as an instructor.

(Pl.'s Ex. 8 at PU-0346.) Dr. Utesch recommended the Plaintiff's reappointment for the 2001–2002 academic year.

Dean Wiener also evaluated the Plaintiff's performance in January 2001 and found him to be a fine and dedicated teacher. She commented favorably on his research and service, and, on January 11, 2001, recommended his reappointment. Six days later, Dr. Hannah recommended reappointment to Chancellor Wartell, who agreed with her decision.

(b) *Plaintiff's Second Evaluation and Academic Year 2001–2002 Performance*

The Plaintiff was next evaluated eight months later, in September 2001. Again, both Dr. Utesch and Dean Wiener found that he was making satisfactory progress in each of the three evaluative areas, and each recommended reappointment. Both Dr. Hannah and Chancellor Wartell approved the recommendations and, in May 2002, the Plaintiff was reappointed for the 2002–2003 academic year.

Before the evaluations were completed, several faculty members observed the Plaintiff in the classroom and were impressed with his teaching. For example, after observing the Plaintiff teach, Dr. Hickey wrote him: "please allow me to thank you for the opportunity to observe an inspiring and effective teacher at work!" (Pl.'s Ex. 11.) Another faculty member, Associate Professor of Education David R. Skeleton expressed his satisfaction with the Plaintiff's teaching in these words: "conduct of the class session displayed excellent preparation on the part of the instructor. [The Plaintiff] is to be commended for instructional techniques utilized in his preparation." (Pl.'s Ex. 12.) Another teacher, Professor Jerry Garret, who also observed the Plaintiff in the classroom wrote:

> My professional opinion is that I observed one of the most outstanding lessons I have ever observed in my 22 years in education. Not enough teachers are commended for the outstanding job that they do. For me, you are definitely a professor to be commended for the excellent job teaching that I observed in your class today.

(Pl.'s Ex. 15.)

14

But despite this admiration from the observers of his classes, the Plaintiff also received complaints about his conduct. Beginning in November 2001, Dr. Utesch began getting student complaints about the Plaintiff's inappropriate classroom behavior. Dr. Utesch informed the Plaintiff about the students' complaints and encouraged him to address them with the students directly. Dr. Utesch believed that the situation would improve with time.

(c) *Plaintiff's Third Evaluation and Academic Year 2002–2003 Performance*

The Plaintiff was again evaluated for reappointment at the beginning of March 2002. Dr. Utesch noted that the Plaintiff has responded to student concerns and has sought three outside observers for his classroom teaching. Recognizing that the Plaintiff continued to respond to student feedback and sought to improve his teaching, on March 25, Dr. Utesch recommended the Plaintiff for reappointment. In his recommendation, Dr. Utesch stated that he was "impressed with his dedication to student learning and responsiveness to student and peer feedback." (Pl.'s Ex. 17.)

Dean Wiener also recommended reappointment on March 22, noting that the Plaintiff received "high student evaluations except for one class this past year." Both Dr. Hannan and Chancellor Wartell agreed with the recommendations, and on April 10, 2002, the Plaintiff was reappointed for the 2003–2004 academic year.

However, student complaints against the Plaintiff continued during the 2002–2003 academic year. In March 2003, S.S.,[2] a graduate student employee at IPFW, approached Dr. Utesch and reported that the Plaintiff had made inappropriate comments to her during her interview for a clinic manager's position. She reported that, in the summer of 2001, the Plaintiff had told her that she

---

[2]The parties agreed to use initials to protect the privacy of student complainants.

15

should wear tighter pants and that she did not have big enough "boobs" because she was white. Also in March 2003, a second graduate student employee, V.H., reported to Dr. Utesch that during his classes the Plaintiff bashed homosexuals and Catholics. Dr. Utesch believed V.H. because her complaints were consistent with those from other students in other classes taught by the Plaintiff. Dr. Utesch asked S.S. and V.H. to discuss their allegations with Dean Wiener.

(d) *Plaintiff's Final Evaluation and Non-reappointment*

From November 2001 through March 2003, Dr. Utesch received six student complaints about the Plaintiff. Two of them were anonymous. All of them accused the Plaintiff of inappropriate behavior. On the basis of these complaints, and especially on the basis of S.S.'s and V.H.'s complaints, Dr. Utesch decided not to recommend the Plaintiff for reappointment for the 2004–2005 academic year. On March 31, 2003, he wrote concerning the Plaintiff's conduct:

> On-going student complaints have become more serious over the past year. I have had several meetings with [the Plaintiff] to attempt to resolve concerns about his teaching effectiveness and his professionalism. There appear to be no changes. Students continue to be subjected to discussion of inappropriate topics irrelevant to the content of the course within the classroom. He has criticized other faculty and students in public settings. His lectures are often unorganized and ineffective. He has consistently failed to fulfill his responsibilities for supervising students in the clinic setting. The School of Education's protocol for the formal evaluation of faculty by students has been violated because [the Plaintiff] did not leave the room while students were completing evaluations. Female students report inappropriate comments about their appearance. The trust and respect of students has been diminished by misuse of power. I conclude that his teaching performance is unsatisfactory.

(Hannah Dep. at Ex. 15)

Dr. Utesch also noted that the Plaintiff remained productive in research and service.[3]

---

[3]Dr. Utesch also received a report from the School of Education's Peer Review Committee that commended the Plaintiff "for his willingness to blend the Research in Counseling course with the Research in Elementary Education course," "for his high level of research productivity," and "for his high level of involvement in

Nevertheless, he concluded that, "because satisfactory teaching performance is essential for progress toward promotion and tenure and based upon all sources of evidence made available to me regarding [the Plaintiff's] performance, I cannot recommend his reappointment." *Id.*

Dean Wiener thought otherwise about the Plaintiff's prospects for the future. About a month before Dr. Utesch's negative recommendation, in February 2003, Dean Wiener recommended the Plaintiff for reappointment, although with some hesitation:

> . . . In the area of teaching there are issues which his chair has discussed with him on various occasions. The problems have been shared with me by both [the Plaintiff] and Dr. Utesch (who is both Chair of Professional Studies and Program Director of Counselor Education) and although I have tried to counsel and make suggestions to both, at this time there seems to be an impasse.
> . . .
> I understand from both Dr. Utesch and [the Plaintiff] that there have been several complaints from students in the Counseling program with regard to [the Plaintiff's] teaching style. Dr. Utesch has kept records of his talks with [the Plaintiff], along with the behaviors he suggests need to be changed. [The Plaintiff] has indicated his willingness to change to meet student needs and asks, "What could I (can I) do differently?" Both he and his Chair appear frustrated—but Dr. Utesch has delineated what the issues are and what he anticipates will be corrected in terms of faculty/student interactions during this spring and summer. I think this will be difficult to resolve although both [the Plaintiff] and Dr. Utesch are very eager for a congenial solution. Human Resources and Affirmative Action officers have been notified of this problem.
> In spite of the above, <u>I recommend [the Plaintiff's] reappointment</u>. This is due to his record of productive research and publications and his eagerness and verbal commitments to work on changing teaching style to better meet the needs of the program and the students.

(*Id.*)

Because the Dean and the Department Chair disagreed about the Plaintiff's future with the university, Dr. Hannah made the ultimate decision regarding his reappointment. She met with both

---

professional organizations." (Pf.'s Ex. 18). Peer Review Committee's reports, such as this one, had no force of recommendation but, if presented, they were considered by the department's chair and the dean during the overall evaluation of a teacher. (*See* Utesch Dep. at 81–82.)

Dean Wiener and Dr. Utesch to discuss their recommendations and reviewed all available
documents. Dr. Hannah also made sure that Dr. Utesch consulted with Judy Dilorio, IPFW's
Affirmative Action Officer, and James Ferguson, IPFW's Human Resources Services Director, to
insure that all procedures were followed. On April 3, Dr. Hannah recommended to not reappoint the
Plaintiff:

> I do not support reappointment of [the Plaintiff] because of unsatisfactory
> performance in teaching. The recommendation for non-reappointment from the chair
> and the equivocal nature of the dean's review raise very serious questions about his
> teaching competence. His two previous reviews identified some concerns but were
> hopeful of improvement. Student complaints of ineffective teaching and a lack of
> professionalism, however, have increased over this past year despite verbal and
> written warnings and efforts at assistance. His research and productivity do not
> compensate for unsatisfactory teaching. I therefore recommend that his appointment
> at IPFW terminate at the end of 2003–04.

(*Id.*) Chancellor Wartell concurred with her recommendation and, that same day, the Plaintiff was
informed of the university's decision.

On May 15, in response to the Plaintiff's request, Dr. Hannah wrote a letter further detailing
the reasons for his non-reappointment. Among other things, she summarized the Plaintiff's faults:

> . . .
> My recommendation is based on an evaluation of ineffective teaching by the Acting
> Chair, Dr. Bill Utesch and serious questions raised by Dean Roberta Wiener. . . .
> Students complain that you berate students publicly, complimenting some and
> criticizing others to the point of humiliation in class. . . . Students also reported that
> you have revealed personal biases about sexual orientation that limit your ability to
> deal with these issues in the counseling setting. . . .
> Unprofessional behavior. Students report that you break confidentiality by sharing
> personal information about some students with others. Students also find the way you
> handle sexual information and topics in the classroom offensive. One student
> reported that you made sexually inappropriate comments about her appearance and
> about what is necessary to be successful. You have made female students
> uncomfortable by insisting that they close your office door over their objections. In
> some classes students report that you told them you could identify handwriting and
> therefore they felt constrained in making negative comments on course evaluations.
> One student reported that you have confronted students who have complained in

18

manner that was considered retaliatory. These behaviors have produced a "chilling effect" that appears to have made learning difficult to the point of at least one student stating that she plans to leave the program. I am especially concerned about the complaints of students who report that you have not been either present or attentive during the times you were responsible for supervising students in a clinic situation. Inconsistent Reports. At the same time that some students have brought very serious claims of ineffectiveness and unprofessional behavior, others have provided glowing testimonies about your work. They report that you have gone out of your way to help them find jobs and prepare for interviews. They find you very professional both in and out of the classroom. They report that they find your classes challenging and excellent preparation for practice. They criticize students who complain as not being willing to perform up to your standards. A number of those who defend you argue that you present a clash of expectations to IPFW students to which some have reacted negatively. Faculty peers who have reviewed your classes also have differing views of your effectiveness in the classroom. Interpreting these inconsistencies is difficult, but the number of student complaints over such a long period convinces me that this is not the case of one or two disgruntled students who can be dismissed as unfair or of one course that did not go well. It is reassuring to know that some students and peers find your work positive, but in so doing highlights the point that other do not.

. . . In successful cases, the faculty member takes the constructive criticism to heart and works hard to change behavior in order to become more effective. To me and to others you seem initially to be willing to respond to the concerns but then become defensive and attempt to argue them away rather than taking responsibility for making improvements. I see no consistent effort to make sure that despite the advice given to you by your peers, your chair, and your dean, your behavior has actually changed in such a way that students would perceive a more professional learning environment.

(Hannah Dep., Ex. 15.)

(e) *IPFW's Investigation of Formal Complaints Against the Plaintiff*

On May 12, 2003, S.S. and V.H. each filed a formal complaint against the Plaintiff, claiming that he harassed and discriminated against them in both the classroom and in their work as graduate assistants. Elaine Blakemore was assigned by Chancellor Wartell to investigate the complaints in accordance with IPFW's procedures. She interviewed the complainants and the Plaintiff, as well as Dr. Utesch and two other faculty members in the Department of Education Studies. She also

19

interviewed thirteen current and former students from the Counselor Education program representing four different academic cohorts.

Blakemore issued a detailed report with extensive findings on both students' complaints. In the report she acknowledged that, because of the gravity of allegations, the investigation was difficult for her personally. She noted that, during the investigation, the Plaintiff was cordial and professional, and that he was bewildered by the charges. (Pl.'s Ex. 25 at 1.) She also stated that she found both complainants credible and genuinely anguished about their experiences. (*Id.*) Blakemore commended S.S. and V.H. for their courage to come forward with their complaints:

> Finally, I would like to express my utmost respect toward [S.S. and V.H.] for their courage coming forward with their complaints. I spoke to several other students who believed that they had been harmed by [the Plaintiff], but were afraid to speak, lest their future careers be harmed. I spoke to former students who said that they had wanted to report their concerns about his behavior once they left the university, but they never had, and that they felt distressed and guilty that they had not. Hence the university should applaud those who are willing to come forward with a serious complaint at possible risk to themselves, particularly when they are taking the risk partly for the good of others.

(*Id.* at 2–3.)

Blakemore interviewed numerous students and asked them general questions about the School of Education and the Plaintiff. Blakemore noted that some of the students were very supportive of the Plaintiff and had no complaints at all; others corroborated the complainants:

> Some expressed shock and dismay about how disrespectfully they thought that other students treated him in the classroom. On balance, though, the majority of students to whom I spoke provided examples of experiences that were consistent with [V.H.'s]' and [S.S.'s] complaints. Since I did not speak to every student who had ever taken a class from [the Plaintiff], I cannot possibly know what percentage of students over the few years . . . found his behavior inappropriate. I can say, however, that many of the students and former students to whom I spoke found several aspects of his behavior inappropriate, and that their accounts were startlingly consistent.

(*Id.* at 2.)

Blakemore concluded her report by finding that the Plaintiff violated the university's policies as to the one complainant, but not as to the other:

> Using the standard of the "preponderance of the evidence" required by the Purdue University procedures, I find that [the Plaintiff] has violated the Purdue University antiharassment policy outlined in Executive Memorandum C-33. With respect to the specific complaints, I find that Ms. [V.H.] has experienced a hostile educational environment, and that she is the victim of harassment. In her complaint she indicated that she had been the victim of discrimination, but I do not find that to be the case. Other students were similarly treated, and I do not know on what grounds she could have experienced discrimination.
> Largely because her complaints were not reported in the appropriate time frame, I cannot find that Ms. [S.S.] has also been specifically harassed under the Purdue policy. However, like other students in the Counselor Education Program, she has certainly been subjected to hostile educational environment.

(*Id.* at 9–10.)

In light of her findings, Blakemore recommended that the Plaintiff "be immediately removed from his teaching and practicum supervision responsibilities, and from supervisor contact with students in the School of Education at IPFW." (*Id.* at 10.) However, she believed that the university should honor his 2003–2004 academic year contract, and that he should be allowed to continue his research so long as he has was veiled from interaction with students. (*Id.*)

Blakemore presented her report to the University's Committee on Equity, which concurred with Blakemore's conclusions. On August 4, 2003, Chancellor Wartell notified the Plaintiff that, for the 2003–2004 academic year, he would be assigned to a position entirely dedicated to research, but that he would not be permitted to use his university office.

On August 2, 2003, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, claiming that the Defendant discriminated against him on the basis of race and national origin.

21

(f) *The Plaintiff's Complaints*

From 2001 until 2003, Dr. Utesch held only two faculty meetings in which the Plaintiff was present. (Pl.'s Dep. 167–68.) At those meetings, in which Dr. Burg was also present, Dr. Utesch talked negatively about certain minority students. (*Id.* at 162.) At one meeting, he suggested that a student who wrote very poorly should not be in the School of Education just because she was black. Another time, Dr. Utesch told the Plaintiff that he was an American Indian but that he did not go around "tooting [his] horn to get special treatment." (*Id.* at 165.) This particular conversation came about as Dr. Utesch was discussing some minority students who thought they deserved to be in the School of Education but whose performance was inferior. (*See id.* at 164–65.) In addition, Dr. Utesch once told the Plaintiff that the Plaintiff was a naturalized United States citizen, not an African-American. (Dilorio Dep. 17.) The Plaintiff complained to Dean Wiener regarding these comments from Dr. Utesch. He also sent an email to Dilorio restating those complaints and describing another time when "Utesch asserted that minority students, particularly females, are uncomfortable to deal with because they are quick to invoke the notion of a lawsuit." (*Id.* at 15–17.) DiLorio met with Dr. Utesch to discuss the Plaintiff's complaints but she believed that the matters asserted in the email did not assert actionable allegations.

The Plaintiff identified seventeen current and former IPFW employees that he claims were similarly situated and treated more favorably than he: Gloria Campbell-Watley (Pl.'s Dep. 183), Phyllis Agnes (*Id.* at 186), Jim Burg (*Id.*), William Utesch (*Id.* at 187), Mark Myers (*Id.*), Janice Schraeder (*Id.* at 188), Sheena Choi (*Id.*), Jerry Garrett (*Id.* at 282), John Cochren (*Id.*), Nancy Cauthron (*Id.* at 283), Joel Nichols (*Id.* at 284), Beverly Park (*Id.* at 284–85), Patricia Sellers (*Id.* at 286), Terri Swim (*Id.* at 287), Kathleen Murphey (*Id.* at 288), Jeffrey Nowak (*Id.* at 289), and Gail

Hickey (*Id.* at 305). The Plaintiff admits that Utesch, Cochren, Cothern, Nichols, Murphey, and Hickey were already tenured when he began working at IPFW. The Plaintiff is not aware if charges from students, similar to his own, were leveled against any of the above listed persons.

Around December 2, 1999, and May 22, 1997, some students complained against professors G.H. and S.C. for poor teaching. These professors are still faculty members at IPFW's School of Education.[4]

With his response to the Defendant's motion for summary judgment, the Plaintiff submitted affidavits from ten former students praising him as a dedicated and qualified teacher and a person of integrity.

### D. Does 1, 2, 3, 4, and 5

Along with the Board of Trustees of Purdue University, the Plaintiff sued Does 1, 2, 3, 4, and 5 for violations of 42 U.S.C. §§ 1981, 1985(3), and 1986. In its motion for summary judgment, the Defendant challenges the Plaintiff's claims against these Does as no longer proper at this stage of the litigation. The Defendant relies on *Doe v. Blue Cross & Blue Shield of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997), which noted that "[t]he use of fictitious names is disfavored, and the judge has

---

[4]Also, in his Statement of Genuine Issues and Material Facts, the Plaintiff states that "when Utesch came up for promotion, the Campus Committee voted 6-0 against the tenure of Utesch. In spite the negative votes, Utesch was granted tenure." *Id.* at 21. The Plaintiff cites page 43 of Utesch's deposition in support of this assertion. The Court has reviewed this page but is unable to determine whether the committee was recommending against Dr. Utesch's tenure or whether it was giving a general negative opinion on Dr. Utesch in its capacity as the peer review committee.

Moreover, the Plaintiff asserts that Professor S.C. was accused of plagiarism and refers the Court to Confidential Exhibit 16. This exhibit contains a letter from an English professor at IPFW, who reviewed a draft of S.C's research article. In the letter, the English professor is expressing her frustration about S.C.'s continual failure to attribute the sources upon which she based her article. This letter is not a formal accusation of plagiarism. Moreover, it is unknown whether S.C. ever submitted the article for publication and whether she corrected the attribution problems. Without this information, and especially without any evidence that the university's administration knew that S.C. published a plagiarized article, the Court finds the Plaintiff's characterization of S.C. as a "plagiarist" overbroad.

an independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts." Further, the Defendant argues that now it would be too late to substitute Does 1 through 5 because any claims against other parties are barred by the two-year statute of limitations.

The Plaintiff has not responded to the Defendant's contentions and seems to have conceded that he cannot proceed against Does 1 through 5. Accordingly, the Plaintiff's claims against Does 1, 2, 3, 4, and 5 are denied as a matter of law.

### E. Plaintiff's 42 U.S.C §§ 1981, 1985(3), and 1986 Claims

#### (1) *Defendant's Immunity*

The Defendant argues that the Plaintiff's 42 U.S.C §§ 1981, 1985(3), and 1986 claims are barred because, as an arm of the state, it is entitled to sovereign immunity under the Eleventh Amendment. The Plaintiff responds that the Defendant is not a State agency and thus is not immune from suit under §§ 1981, 1985(3), and 1986. He submits that finding of immunity is a fact sensitive inquiry and that the Defendant has not established IPFW's general legal status. Finally, the Plaintiff suggests that the Defendant is not protected by immunity because, among other things, it was sued for injunctive relief.

"The jurisdictional bar of the Eleventh Amendment protects the state and its agencies; it does not shield political subdivisions." *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987). Whether a state university is like a state agency or like a political subdivision depends on the specific facts of the case. The courts especially consider the extent of the university's financial autonomy from the state: "the extend of state funding, the state's oversight and control of the

24

university's fiscal affairs, the university's ability independently to raise funds, whether the state taxes the university, and whether a judgment against the university would result in the state increasing its appropriations to the university." *Id.* The Seventh Circuit has previously held that "Purdue is entitled to Eleventh Amendment immunity." *Id.* at 846.

IPFW is not its own entity but a regional campus of Purdue and IU. It is completely controlled by Purdue, which has full power, authority, and responsibility to manage and operate IPFW for the benefit of Purdue and IU. Purdue is responsible for IPFW's business operations, including its fiscal management and control. IPFW's chancellor is appointed and employed by Purdue (with the approval of IU) and reports to the Purdue president. Purdue appoints and employs all administrative officers, faculty, and staff members. Finally, Purdue charges and collects all tuition and fees related to IPFW.

As this case itself exemplifies, a suit against IPFW is really a suit against Purdue. (*See* Pl.'s Mot. Amend Caption, September 9, 2004, Docket Entry 16 (stating that, in accordance with Ind. Code 20-12-36-4, the proper defendant in this case is the Board of Trustees of Purdue University, not IPFW)). Yet, as noted above, Purdue is immune from damages under the Eleventh Amendment. *Kashani*, 813 F.2d at 845. Therefore, the Plaintiff's claims for damages under §§ 1981, 1985(3), and 1986 are barred.

However, Purdue is not immune from suit for injunctive relief, which the Plaintiff has requested in his Complaint. *Kashani*, 813 F.2d at 848 ("[A] suit for prospective injunctive relief is not deemed a suit against the state and thus is not barred by the Eleventh Amendment."). Therefore, the Court must examine whether the Plaintiff is entitled to injunctive relief under 42 U.S.C. §§

1985(3) and 1986.[5]

**(2) *Plaintiff's Claims for Injunctive Relief under §§ 1985(3) and 1986***

The Plaintiff claims that the Defendant conspired with S.S. and V.H to deprive him of equal protection of the law as provided by the Fourteenth Amendment, in violation of 42 U.S.C. §§ 1985(3) and 1986. The Defendant argues that no conspiracy was possible in this case because all the actors belong to the same corporation, and a corporation cannot conspire with itself.

Section 1985(3), although not a source of substantive rights, is a remedial statute that prohibits conspiracies to deprive a person of rights guaranteed by the Constitution or federal laws:

> [i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages . . . .

42 U.S.C. § 1985(3). The courts have identified four elements necessary to make out a valid case under § 1985(3):

> (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*Quinones v. Szorc*, 771 F.2d 289, 291 n.1 (7th Cir.1985) (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)).

In this case, the Plaintiff is unable to satisfy the first element, that is, to show that the

---

[5]Since the Plaintiff has also alleged Title VII claims, which are not barred by the Eleventh Amendment, *see Nanda v. Bd. of Trustees of Univ. of Ill.*, 303 F.3d 817, 831 (7th Cir. 2002) ("[W]e hold that the 1972 Act validly abrogated the States' Eleventh Amendment immunity with respect to Title VII disparate treatment claims."), the Court will not separately consider the Plaintiff's claim under 42 U.S.C. § 1981, as both Title VII and § 1981 employ the same analysis. *See Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001).

Defendant conspired with others to deprive him of equal protection of the law. To be a conspirator, the Defendant would have to have a co-conspirator or co-conspirators with whom to conspire. In a corporate conspiracy, co-conspirators must be outside of the corporation. *See Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990) ("[I]ntra-corporate discussions lie outside [§] 1985(3)'s domain."). Yet, all persons accused of conspiring against the Plaintiff—Chancellor Wartell, Dr. Hannah, Dr. Utesch, as well as S.S. and V.H—worked for the Defendant at the time of the alleged conspiracy.

In passing, the Plaintiff states that *Travis*'s intra-corporate conspiracy doctrine would not apply here, because the Defendant's employees have been motivated solely by personal bias. *Cf. Hartman v. Bd. of Trs. of Cmty. Coll. Dist. 508*, 4 F.3d 465, 470 (7th Cir. 1993) (noting that intra-corporate conspiracy doctrine does not apply where persons are motivated solely by personal bias). The Plaintiff does not expound on the facts that would establish that the Defendant's employees' choice not to reappoint him was motivated solely on the grounds of their personal racial animus against him. He does state, although without any specific evidence, that V.H. was inspired to injure him by strong dislike for him because she received a "B" in his class rather than an "A." But in any case, a dislike of a teacher because of a bad grade is not equivalent to a personal racial bias. As to the remaining persons, the Plaintiff has failed to establish that they were motivated solely by their racial animus so that the Defendant's interests in maintaining quality education program played no interest at all in their decisions. *See id.* (where the plaintiff has not shown that the accused employees' actions were not at all motivated by the defendant's interests in its education success, the court cannot conclude that the employees' acted solely out of personal bias against the plaintiff, and thus outside of the scope of their employment). Accordingly, the Court cannot find that any alleged agreement among the Defendant's employees to harm the Plaintiff constituted a conspiracy

27

within the meaning of § 1985(3).

Since the Plaintiff is unable to establish the first element under § 1985(3), the Court need not proceed any further.[6] Similarly the Court does not have to address § the 1986 claim, which to be actionable, requires a violation under § 1985:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented. . . .

42 U.S.C. § 1986.

## F.  Title VII Claim

The Plaintiff sued the Defendant for discrimination on account of race and national origin under Title VII of the Civil Rights Act of 1964, as amended,[7] 42 U.S.C. § 2000e *et. seq.*, which prohibits such discrimination: "It shall be an unlawful employment practice for an employer— (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, . . . or national origin." 42 U.S.C.A. § 2000e-2. The Plaintiff concedes that he has no direct evidence of discrimination but argues that he can overcome the Defendant's motion for summary judgment through the indirect, burden-shifting *McDonnell Douglas* framework.

---

[6]Nor could the Plaintiff establish that the Defendant deprived him of equal protections of law (the second requirement of the test). As explained below, the Plaintiff's claim that he was not-reappointed because of discriminatory reasons fails as a matter of law.

[7]Initially, the Plaintiff also accused the Defendant of retaliation against him for exercising his rights under Title VII. The Defendant moved the Court to dismiss the claim as one that exceeds the scope of the Plaintiff's EEOC charge. The Plaintiff has not responded to the Defendant's arguments and appears to have conceded this claim. Accordingly, the Court will award summary judgment in favor of the Defendant on the Plaintiff's Title VII retaliation claim.

The Defendant insists that the Plaintiff can neither establish a *prima facie* case under *McDonnell Douglas* nor show that the Defendant's stated nondiscriminatory reason for his suspension and eventual termination—that the Plaintiff engaged in improper conduct— was merely a pretext for discrimination.

### (1) *McDonnel Douglas Test*

The Plaintiff has chosen the *McDonnell Douglas* indirect method to show that the Defendant's decision to not renew a teaching offer was motivated by a prohibited animus. Under this approach, he must first establish a *prima facie* case of race and national origin discrimination. To do that, he "must demonstrate that: "(1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated others not in his protected class received more favorable treatment." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

> If she succeeds in establishing the *prima facie* case of race or national origin discrimination,
>
> the burden of production shifts to the defendant to offer a permissible, noninvidious reason for the alleged discrimination. If the defendant meets this production burden, the plaintiff may then rebut that evidence by showing that the employer' reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (citations omitted). "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). If pretext is demonstrated, the case must go to trial. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001).

The Plaintiff has established without difficulty the first and third prongs of the *prima facie*

case: he is an African-American from Ghana and he has not been reappointed for the 2004–2005 academic year. However, the second and fourth elements—whether similarly situated others not in his protected class received more favorable treatment that he did and whether his performance met the Defendant's legitimate expectations—require careful analysis, especially, since they are closely intertwined with the pretext analysis. The Court will consider them together with the Plaintiff's claim that the Defendant's reasons for firing him were pretextual. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 600 (7th Cir. 2001) (where *prima facie* analysis would overlap substantially with the question of pretext, the court may address the two together).

(a) *Similarly Situated Employees*

Returning to the *prima facie* case, the Plaintiff may not prevail against the Defendant's motion for summary judgment because he has failed to designate evidence of similarly situated comparators who were treated more favorably than he was. To establish that employees not in the protected class were treated more favorably, the Plaintiff must show that those employees were similarly situated with respect to "performance, qualifications and conduct," *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002), and that "the relevant aspects of [their] employment situation were nearly identical to [the] alleged comparator[s]." *Nunnery v. Elgin, Joliet & E. Ry.*, 48 F. Supp. 2d 1122, 1131 (N.D. Ind. 1999) (citations and quotation marks omitted). "Such a showing normally entails establishing that 'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Snipes*, 291 F.3d at 463 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)); *see also Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (to meet his burden the plaintiff must

30

demonstrate that there is someone directly comparable to him in all material respects). In addition, the Plaintiff must establish that the similarly situated employees were treated more favorably at the time of the alleged discrimination against him. *Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005).

During his deposition, the Plaintiff identified seventeen current and former IPFW employees that he claims were similarly situated to him but were treated more favorably than he. However, the similarities of which the Plaintiff speaks relate only to his ability to teach, write, and research. The Plaintiff has not shown similarities as to the status of these individuals or any detrimental conduct, similar to his own, that they were accused of. For example, the Plaintiff believes that the tenured faculty members—Utesch, Cochren, Cothern, Nichols, Murphey, Hickey—are directly comparable to him, but that, unlike him, they were allowed to advance in their academic careers. The Plaintiff is mistaken in three respects: First, at the time of the alleged discrimination against the Plaintiff, the tenured faculty members, by the virtue of their tenure, were not directly comparable to the Plaintiff in all material respects. The Plaintiff was not a tenured professor and was subject to different standards than the tenured ones. Second, the advancement of these tenured members did not take place at the same time that the Plaintiff was not reappointed. Finally, the Plaintiff has not presented evidence that the tenured professors were accused of engaging in inappropriate conduct with students.

As to the remaining eleven employees, the Plaintiff provides no specifics, aside from the fact that Dr. Hickey believed that the Plaintiff's research was comparable to Burg's, Agnes's, and Choi's. The Plaintiff asks the Court to disregard the students' allegations against him as frivolous and compare him to others only as to his academic abilities. The Court has no right to pick and choose what it wants to compare; rather it is the Plaintiff's burden to show that he and the proffered

comparators are similar in all material respects. This he has failed to do. Furthermore, the subject matter of the complaint, that a teacher abused his position of authority, is grave, not frivolous.

The Plaintiff also claims that one of the comparators was accused of plagiarism, but, as noted above, fails to provide any evidence of that. (*See supra* at 23 n.4.) Finally, the Plaintiff has failed to explain when and how the remaining eleven employees were treated more favorably than he.

(b) *Pretext*

The Defendant maintains that the Plaintiff was not reappointed for the 2004–2005 academic year because he was not meeting its legitimate expectations: Dr. Hannah reviewed both Dean Wiener's recommendation for reappointment and Dr. Utesch's recommendation for non-reappointment, and decided that the accusations about the Defendant's inappropriate behavior outweighed the positive aspects of his employment.[8]

In response, the Plaintiff offers a two-paragraph rebuttal insisting that the Defendant's stated reasons have no basis in fact. He maintains that the allegations against him were unverifiable and unsubstantiated, and that the Court can infer from the falsity of the Defendant's explanation that it is dissembling its discriminatory purpose. The Court disagrees.

The Plaintiff has failed to present enough evidence to cast the shadow of pretext on the Defendant's explanation why he was not reappointed. It is not sufficient for the Plaintiff to show that some or all of the students' allegations about the Plaintiff's inappropriate behavior were made up by those students. It is also insufficient for the Plaintiff to show that previous recommendations from Dr. Utesch praised his abilities and zeal for teaching, and that some faculty members, as well as

---

[8]This assertion also goes to the Defendant's claim that the Plaintiff was not performing his job satisfactorily.

many students, perceived him as an excellent teacher. *Cf. Peele v. Country Mut. Ins. Co.*, 288 F.3d

319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an

employee was meeting an employer's legitimate employment expectations, the issue is not the

employee's past performance but 'whether the employee was performing well at the time of [his]

termination.'" (citation omitted)); *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1460 (7th

Cir. 1994) ("Our cases also give little weight to statements by supervisors or co-workers that

generally corroborate a plaintiff's own perception of satisfactory job performance."). Rather, he must

show that Dr. Hannah, the person who made the ultimate decision not to reappoint the Plaintiff, or

Dr. Utesch who passed the complaints on to her, made up the students' allegations, did not truly

believe them, or found them insignificant. In a word, the Plaintiff must establish that Dr. Hannah's

and Dr. Utesch's reasons for the Plaintiff's non-reappointment were merely made up to cover up

their discriminatory reasons.

    Yet, the evidence points to the contrary. Even Dean Wiener's recommendation for

reappointment was not without some hesitation. She recognized some of the Plaintiff's flaws but

believed that his research skills, publications, and his verbal commitment for improvement

outweighed them. She was also confident that the Plaintiff was going to correct his interactions with

the students during the coming months. Dr. Utesch, on the other hand, noted that the student

complaints had become more serious over the past year, compromising all positive aspects of the

Plaintiff's work: "female students report inappropriate comments about their appearance," and "[t]he

trust and respect of students has been diminished by misuse of power." (Hannah Dep., Ex. 15.)

    Dr. Hannan, faced with contradicting recommendations from her subordinates, met with

Dean Wiener and Dr. Utesch to discuss their recommendations and reviewed all available

documents. She even made sure that Dr. Utesch consulted with Judy Dilorio, IPFW's Affirmative

Action Officer and James Ferguson, IPFW's Human Resources Services Director, to insure that all procedures were followed. Then, after considering both sides, she decided against the Plaintiff's reappointment, citing the students' complaints of ineffective teaching and a lack of professionalism, "which have increased over this past year despite verbal and written warnings and efforts at assistance." *Id.*

After the Plaintiff asked Dr. Hannah for a more detailed explanation for her reasons not to reappoint him, she sent him a letter. In the letter, she reiterated her earlier comments and further expanded on her rationale. She noted some of his unprofessional behavior in and out of class and his stated biases against homosexuals. Dr. Hannah also noted the positive reports about the Plaintiff, but did not think that they compensated for the Plaintiff's faults.

The Plaintiff challenges his non-reappointment only by calling into question the reliability of the students' complaints and by referring to his previous positive evaluations. The Plaintiff, who bears the burden to show pretext, does not provide the Court with a reason to believe that Dr. Hannah or Dr. Utesch simply made up the stories of the students' complaints, by themselves or in collaboration with the students. He refers to Dr. Utesch 's conversation with S.S. and V.H. at the racquet club as indication of conspiracy, but he is unable to supply any basis for this claim.[9] Further, he states that V.H. hated the Plaintiff because she received a "B" in his class: "[she] set out a plot to malign him. Utesch and S.S. got on board and set out a course that has resulted in the utter destruction of [the Plaintiff's] career in academia." (Pl.'s Resp. at 9). Again, the Plaintiff does not single out any part of the record to support these allegations. Finally, the Plaintiff points to Blakemore's report as a document that exonerates him of S.S.'s and V.H.'s allegations. However,

_____

[9]S.S.'s testified during her deposition that she approached Dr. Utesch with a friend because she was "very upset about it and it was scary to bring—to say what he said." (S.S.'s Dep. at 16).

such assertion is a stretch.

In her report, Blakemore did note that some students she interviewed were very supportive of the Plaintiff and had no complaints against him at all. Yet, there were also those who corroborated the complainants' allegations. She wrote: "On balance . . . the majority of students to whom I spoke provided examples of experiences that were consistent with [S.S.'s] and [V.H.'s] complaints. . . . I can say . . . that many of the students and former students to whom I spoke found several aspects of his behavior inappropriate, and that their accounts were startlingly consistent." (Pf.'s Ex. 25 at 2.) Blakemore also stated that she

> would like to express her utmost respect toward [S.S. and V.H.] for their courage coming forward with their complaints. I spoke to several other students who believed that they had been harmed by [the Plaintiff], but were afraid to speak, lest their future careers be harmed. I spoke to former students who said that they had wanted to report their concerns about his behavior once they left the university, but they never had, and that they felt distressed and guilty that they had not. Hence the university should applaud those who are willing to come forward with a serious complaint at possible risk to themselves, particularly when they are taking the risk partly for the good of others.

(*Id.* at 3.)

Regarding S.S.'s complaints, Blakemore concluded that, although they were brought too late procedurally, they confirmed a pattern of hostile educational environment the Plaintiff created:

> Because many events reported by [S.S.] took place outside the 120-day limit, and although plausible, the telephone calls cannot be verified, I find it very difficult to conclude that [S.S.] was specifically the victim of harassment. However, most of her reported experiences are very consistent with those of others, and can be seen as part of a pattern which leads me to conclude that [the Plaintiff] has created a hostile educational environment for students in the Counselor Education Program at IPFW.

(*Id.*)

Regarding V.H.'s complaints, Blakemore determined that four out of the ten accusations were consistent with the overall responses from the persons interviewed: (1) excessive discussion

35

of sexuality in class; (2) discussing performance of other students by name, generally in derogatory fashion; (3) denigrating students' performance publicly; and (4) fear of the Plaintiff, and what he might to do to harm the students academically or professionally. (*Id.* at 9.) This lead Blakemore to find that the Plaintiff "has violated the Purdue University antiharassment policy," (*Id.*) and to recommend that the Plaintiff "be immediately removed from his teaching and practicum supervision responsibilities, and from any supervisory contact with students in the School of Education at IPFW." (*Id.* at 10.)

Since the Plaintiff is unable to demonstrate that Dr. Hannah and Dr. Utesch manufactured claims against him, he has not rebutted the Defendant's stated reasons for his termination. Furthermore, Dr. Utesch's remarks about minorities do not prove pretext. As the Defendant points out, Dr. Utesch's remarks were not sweeping general statements about minorities. Rather, the statements were about specific applicants or a group of applicants who wrote poorly or whose performance was otherwise inferior. Dr. Utesch complained about these individuals and stated his belief that they should not be admitted to the School of Education just because they were minorities. As such, even if considered in the light most favorable to the Plaintiff, the statements do not support an inference that Dr. Utesch or Dr. Hannah made their recommendations to not reappoint the Plaintiff for any improper reason. Similarly, Dr. Utesch's undated statement that "minority students, particularly females, are uncomfortable to deal with because they are quick to invoke the notions of a lawsuit" is too obscure to demonstrate pretext in the Defendant's stated reason for the Plaintiff's non-reappointment. *Cf. Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) (a supervisor's undated statement about older employees, "Bob, you know how hard it is to sell these guys and they just don't look like they work as hard," was too obscure to express prejudice on the basis of age).

What is more, even if questionable, Dr. Utesch's statements must be considered in light of his recommendation to the search committee to consider the Plaintiff for a teaching position at the School of Education. When Dr. Utesch recommended the Plaintiff to the committee, as the Department Chair, he knew that the Plaintiff would be working toward a tenure with the school. He could have bypassed him then but did not. Since he was instrumental in both hiring and firing the Plaintiff, an inference against discrimination on his part, even if limited, exists. *See E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir.1996) ("The same hirer/firer inference has strong presumptive value."); *but cf Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 745 (7th Cir. 1999) (noting that the same-actor inference is unlikely to be dispositive in very many cases because the hiring and firing supervisor "might be unaware of his own stereotypical views of African-Americans at the time of hiring).

Importantly, the Plaintiff has not produced any evidence suggesting Dr. Hannah's racial animus. After meeting with both Dean Wiener and Dr. Utesch and after reviewing available documentation, she exercised the final decision making authority not to reappoint the Plaintiff. She also made sure that Dr. Utesch consulted with Dilorio, IPFW's Affirmative Action Officer, to insure that proper procedures were followed. Dr. Hannah did not believe that the Plaintiff's research and productivity compensated for his flaws, and the Plaintiff has not been able to shown anything that would contradict that.

The Court will not second guess Dr. Hannah's legitimate business reason and will not assume the role of a super personnel department. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) ("Above all, we are mindful that courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions."). The evidence before the Court does not suggest a pretext for discrimination. Accordingly, the Plaintiff cannot

37

prevail on his Title VII claim.


**G.  State Law Claims**

Along with the federal claims, the Plaintiff has alleged four causes of action under the Indiana Tort Claims Act (ITCA): intentional infliction of emotional distress, negligent infliction of emotional distress, negligent supervision, and wrongful termination. The Defendant argues that such claims are improper because the Plaintiff did not provide a timely tort claims notice as required by the Act. The Plaintiff disagrees and maintains that he "substantially complied" with the ITCA.

Each of the Plaintiff's four claims is subject to ITCA's procedural and substantive requirements. *See Bienz v. Bloom*, 674 N.E.2d 998, 1003 (Ind. Ct. App. 1996) ([O]ur supreme court has held that the Act applies to all torts."). Compliance with the ITCA is a prerequisite to pursuing a tort claim against a state university, such as the Defendant, regardless of whether suit is filed in state or federal court. One of ITCA's requirements is to give notice of tort claims to the defendant's government body, in this case the Defendant itself, within 180 days after the alleged losses occur. *See* Ind. Code § 34-13-3-8(a); § 34-6-2-110(7); *see also Kelly v. City of Michigan City*, 300 F. Supp. 2d 682, 689 (N.D. Ind. 2004) (granting summary judgment against plaintiff who failed to file tort claims notice within 180 days of the alleged violation).[10] "The purpose of the notice is to provide an opportunity for [the defendant] to investigate, determine liability and prepare a defense to the tort claim." *Orem v. Ivy Tech State College*, 711 N.E.2d 864, 869 (Ind. Ct. App. 1999). According to the

---

[10]It is important to note that "the notice of claims under Ind. Code 34-13-3-8 regarding a political subdivision or municipal corporation is not affected by its status as a state agency for purposes of Eleventh Amendment immunity. This is illustrious in cases where universities and colleges are arms of the state for purposes of Eleventh Amendment immunity but for purposes of notice are considered political subdivisions or municipal corporations." *Kelley v. City of Michigan City*, 300 F. Supp. 2d 682, 689 (N.D. Ind. 2004) (citing *Schoeberlein v. Purdue Univ.*, 544 N.E.2d 283 (Ill. 1989); and *Van Valkenburg v. Warner*, 602 N.E.2d 1046 (Ind. Ct. App. 1992)).

explicit language of the ITCA, a plaintiff's state claims accrue when the alleged losses occur. Ind. Code § 34-13-3-8(a). "Whether a party has complied with the notice requirements of the Act is a question of law to be determined by the court." *Orem*, 711 N.E.2d at 869.

In this case, the Plaintiff received a notice of non-reappointment from Chancellor Wartell on April 3, 2003. The notice stated that the Plaintiff's employment with the Defendant would expire on May 12, 2004. The Plaintiff then requested that Dr. Hannah provide a detailed explanation as to why he was not reappointed. Dr. Hannah responded to his request on May 15, 2003. Next, the Plaintiff initiated a grievance process and participated in Chancellor Wartell's investigation into the students' complaints against him. The investigation concluded on June 30, 2003, and, in August 2003, the Plaintiff was instructed to conduct his research outside the university campus. On May 12, 2004, the Plaintiff's employment with IPFW ended. On October 5, 2004, the Plaintiff sent a notice to the Defendant's governing body regarding his tort claims under ITCA.

The Plaintiff asserts that his losses as a result of the Defendant's tortious acts did not occur until May 12, 2004, when he was terminated from the school. Accordingly, he argues that the torts claim notice was timely so long as it was sent before November 9, 2004, that is, within 180 days after May 12, 2004. Such assertion is inconsistent with two of the Plaintiff's four claims: intentional infliction of emotional distress and negligent infliction of emotional distress. The Plaintiff cannot sincerely maintain that his losses, as a result of the Defendant's alleged intentional and negligent infliction of emotion distress, did not occur until May 12, 2004. His own testimony demonstrates that he was upset as soon as he was accused of sexually harassing his students and informed that his contract would not be renewed. This happened on April 3, 2003, and the matter was finally settled around August 2003. The Plaintiff's claims regarding the infliction of emotional distress do not concern the loss of income, which he did not suffer until May 12, 2004, but the loss of emotional

39

stability, which allegedly began a year earlier. Therefore, the Plaintiff's October 5, 2004, tort notice regarding those two claims was late.

In contrast, the notice regarding the Plaintiff's negligent supervision and wrongful termination claims was timely. Under these claim, one of the Plaintiff's losses—the loss of employment—occurred on May 12, 2004. Therefore, a notice regarding these claims filed on October 5, 2004, fell within 180 days of the Plaintiff's alleged losses, as required by the ITCA. Nevertheless, the Plaintiff may not proceed to trial on these claims because they fail on their merits. The first two claims, even if they were not procedurally barred, would have also failed on their merits, as the Court will now explain.

**(1)** *Intentional Infliction of Emotional Distress*

In Count V of the Complaint, the Plaintiff states that the Defendant's decision to not reappoint him was "in wanton disregard of the rights and feelings of Plaintiff and constitutes despicable conduct." (Pf.'s Comp. at 14.) The Defendant moved for summary judgment on this claim, arguing that the Plaintiff has not demonstrated that the Defendant engaged in extreme and outrageous conduct. The Plaintiff insists that the totality of the circumstances in this case reveals the contrary.

In Indiana, to maintain a cause of action for intentional infliction of emotional distress, a plaintiff must show that the defendant intentionally or recklessly engaged in extreme and outrageous behavior and caused severe emotional distress to the plaintiff." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (citing Restatement (Second) of Torts § 46)). Conduct is extreme and outrageous

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one

40

in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (citations omitted).

The Plaintiff has not presented any evidence that he indeed suffered severe emotional distress as a result of his non-reappointment or the accusations brought against him. He vaguely refers to his outburst during a deposition, which, according to him, demonstrates the trauma he suffered. Besides that uncited reference, he presents no facts that would allow the Court to conclude that he has endured significant emotional pain.

But more importantly, the Defendant's decision to not reappoint him was not extreme or outrageous. As explained above, the Plaintiff was accused of inappropriate behavior with his students and of unsatisfactory teaching, which resulted in eventual termination of his employment. IPFW initiated an investigation and interviewed numerous people. The investigator concluded that the students' allegations against the Plaintiff were credible and that the Plaintiff violated the university's antiharassment policy. In light of these facts, the Defendant's decision to prohibit the Plaintiff from attaining a tenure is not the kind of action that makes one cry, "Outrage!" *Cf. Joganic*, 776 N.E.2d 1251, 1264 (Ind. App. 2002) (Here, [the plaintiff's] claim of intentional infliction of emotional distress fails as a matter of law because [the defendant's] act of firing him pursuant to its disciplinary policy does not constitute extreme and outrageous conduct.").


**(2)** *Negligent Infliction of Emotional Distress*

In Count VI of the Complaint, the Plaintiff claims that the Defendant negligently inflicted emotional distress upon him when it terminated him as a result of false sexual harassment accusations. He claims that he sustained the kind of emotional trauma that is normally expected to

occur in a reasonable person who has been discharged under the same circumstances. The Defendant insists that the Plaintiff has not presented any evidence of the purported emotional trauma.

To recover under the theory of negligent infliction of emotional distress, "a plaintiff must satisfy the 'impact rule.'" *Joganic*, 776 N.E.2d at 1263. Before 1991, under the impact rule, a plaintiff had to show that the impact caused him physical injury. However, Indiana Supreme Court, in *Shuamber v. Henderson*, 579 N.E.2d 452 (Ind.1991), reduced the physical injury requirement to "emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person." *Id.* at 456. "The modified impact rule maintains the requirement that the plaintiff demonstrate that he or she suffered a direct physical impact. However, now, the impact need not cause a physical injury to the plaintiff and the emotional trauma suffered by the plaintiff need not result from a physical injury caused by the impact." *Joganic*, 776 N.E.2d at 1263. "[T]he direct impact is properly understood as being 'physical' in nature. *Id.* (citing *Ross v. Cheema*, 716 N.E.2d 435, 437 (Ind.1999)).

The Plaintiff has failed to evince that he sustained a direct physical impact during his termination from the university or, as explained in the previous section, that he suffered a serious emotional trauma. Accordingly, his claim for negligent infliction of emotional distress must fail.


**(3)** *Negligent Supervision*

In Count VII of the Complaint, the Plaintiff claims that the Defendant "negligently failed to train its supervisors and administrative personnel regarding nondiscriminatory practices as required by the laws of the State of Indiana and the United States." (Pf.'s Comp. at 15.) In its motion for summary judgment, the Defendant argues that, as a governmental entity it is statutorily immune from claims for negligent hiring and supervision because such claims fall within the discretionary

42

function of governmental entities. The Plaintiff responds that the Defendant's decision not to reappoint him is not protected by statutory immunity because it did not constitute a policy consideration.

In this latter argument, the Plaintiff reveals some confusion as against whom he brings his negligent supervision claim. His claim is against the Defendant for negligent supervision, that is, for its failure to properly train its supervisors regarding fair employment practices, not against Dr. Utesch, Dr. Hannah, and Chancellor Wartell for negligently terminating him. Therefore, in evaluating the Plaintiff's claim, the Court will consider the Defendant's responsibility to properly train its supervisors, not their actual conduct.

Although governmental agencies may be liable under the Indiana Tort Claims Act, no such liability exists for "the performance of any discretionary function." Ind. Code § 34-13-3-3(7). However, the Court need not decide whether the immunity applies to the Defendant, for even if it does not, the Plaintiff has not presented any facts that would raise a triable issue of fact as to his negligent supervision claim. The Plaintiff neglects to point out what the Defendant did or did not do that constituted negligent supervision of Dr. Utesch, Dr. Hannah, and Chancellor Wartell. Without evidence of the Defendant's underlying offense, all considerations of immunity are moot. At the summary judgment junction, the Plaintiff may not rely only on the bare assertions of his pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994) (once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings; instead, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial"). Accordingly, regardless of whether statutory immunity applies to the Defendant, the Plaintiff's negligent supervision claim

43

must fail.

**(4)** *Wrongful Termination*

In Count VIII of the Complaint, the Plaintiff alleged that he was wrongfully terminated when he voiced his concerns about racial disparity in the university's admissions to the Counselor Education Program. The Defendant moved for summary judgment on this claim, and the Plaintiff has not disputed its contentions. Accordingly, the Court will enter summary judgement for the Defendant regarding the Plaintiff's wrongful termination claim. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005) (finding that unsupported and undeveloped arguments and claims are waived).

## CONCLUSION

As explained in this Opinion and Order, the Court GRANTS in PART and DENIES in PART the Defendant's Motion to Strike [DE 44]. In addition, the Court GRANTS the Defendant's Motion for Summary Judgment [DE 33].

Finally, the Defendant's Motion to Bifurcate Damages Issues [DE 54] and Plaintiff's Motion to Clarify Court's Preliminary Ruling [DE 64] are rendered MOOT.

SO ORDERED on November 9, 2005.


    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT